# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **WELLS FARGO CLEARING SERVICES, LLC** )<br>**ONE NORTH JEFFERSON AVENUE** :<br>**ST. LOUIS, MISSOURI, 63103,** )<br>:<br>　　Plaintiff, )<br>:<br>v. )<br>:<br>**STEVEN L. SATTER** )<br>**11605 KNIGHTSBRIDGE PLACE** :<br>**WELLINGTON, FLORIDA, 33449** )<br>:<br>　　DEFENDANT. ) | Case No. <u>1:22-cv-00539</u><br><br>Judge _____ |

## COMPLAINT
### Jury Demand Endorsed Hereon

Plaintiff, Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors, LLC ("WFA"), by its attorneys, respectfully submits this Complaint against Defendant, Attorney Steven L. Satter, Esq. ("Attorney Satter"), and alleges as follows:

1. This action arises from Attorney Satter's role in a scheme that resulted in the simultaneous, coordinated departure of seven (7) WFA financial advisors and other staff (collectively, the "Former Employees") from WFA's branch office in Kenwood, Ohio ("Kenwood Branch") on June 6, 2022. Those seven advisors represented over $1,200,000,000 of the assets under management ("AUM") at the Kenwood Branch.

2. Attorney Satter and the Former Employees plotted to take significant business from WFA to DayMark Wealth Partners ("DayMark"), a WFA competitor that was formed in March 2022 and which is now located just a few miles from WFA's Kenwood Branch.

1

3. Prior to DayMark's opening, Attorney Satter was a senior in-house counsel for Wells Fargo Bank, N.A. ("Wells Fargo"), specifically assigned to support WFA, Wells Fargo's financial advisory and brokerage business.

4. Attorney Satter's involvement in the group departure and role at DayMark represent a total disregard for and violation of his duties and obligations to his former long-term client, WFA.

5. While at Wells Fargo, Attorney Satter's role, indeed his sole function, was to represent and advise WFA regarding financial advisor hiring practices, raiding claims, fiduciary duty claims, and financial advisors' non-solicitation and other contractual obligations.

6. Attorney Satter was in possession of WFA's confidential and privileged information regarding WFA's approach to disputes in these areas, and he used his inside knowledge of WFA's legal playbook on these issues to advise and assist the Former Employees and DayMark regarding the very same issues in the context of their coordinated departure from WFA and building a competing business at DayMark.

7. Attorney Satter conspired with the Former Employees to: (a) create DayMark, (b) plan the June 6, 2022 coordinated departure, and (c) unlawfully compete with WFA.

## THE PARTIES

8. WFA is a Delaware limited liability company with its principal place of business in St. Louis, Missouri. It is the financial advisory and brokerage arm of Wells Fargo.

9. Attorney Satter is a lawyer. On information and belief, he is a citizen of the United States and a resident of the State of Florida. From August 2008 until April 15, 2022, Attorney Satter was employed as in-house counsel for Wells Fargo and was specifically assigned to support WFA in a region that included the Kenwood Branch.

10. Although not parties to this action, the seven financial advisors who simultaneously resigned from WFA on June 6, 2022 and immediately started working at DayMark are parties to a pending FINRA arbitration (the "FINRA Arbitration"). They are:

- Michael Quin: In addition to being a WFA Financial Advisor, Mr. Quin was WFA's "Market Manager" for Ohio. He joined WFA in August 2013 and resigned with the others on June 6, 2022. He is a "founder" of DayMark and is now responsible for managing DayMark and growing its business;

- Jason Beischel: Mr. Beischel was a Financial Advisor for WFA (and its predecessors) from September 2006, until June 6, 2022. He is one of the "founders" of DayMark;

- Peter Boland: Mr. Boland was a Financial Advisor for WFA (and its predecessors) from November 2007, until June 6, 2022. He is one of the "founders" of DayMark;

- Daryl Demo: Mr. Demo was a Financial Advisor for WFA from August 2014, until June 6, 2022. He is one of the "founders" of DayMark;

- Michael Larison: Mr. Michael Larison was a Financial Advisor for WFA (and its predecessors) from February 2006, until June 6, 2022. He is one of the "founders" of DayMark;

- Robert Prangley: Mr. Prangley was a Financial Advisor for WFA (and its predecessors) from November 2007, until June 6, 2022. He is one of the "founders" of DayMark; and

- Eric Larison: Mr. Eric Larison was a Financial Advisor for WFA from August 2016, until June 6, 2022. He is a "wealth manager" at DayMark.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this case. Federal diversity jurisdiction exists under 28 U.S.C. §1332 because WFA and Attorney Satter are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Attorney Satter as he is one of the founders and counsel of DayMark, which has its sole office in Cincinnati, Ohio.

13. Attorney Satter transacts business in this District and committed acts in this District that caused injury to WFA.

14. Venue in this judicial District is proper because a substantial part of the events or omissions giving rise to the WFA's claims occurred in this District. 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

A. ATTORNEY SATTER'S ROLE AND KNOWLEDGE OF OBLIGATIONS APPLICABLE TO OTHERS

15. Attorney Satter became employed by Wells Fargo in 2008.

16. From 2008 until April 15, 2022, Attorney Satter was responsible for WFA employment and litigation matters in a region that included the Kenwood Branch.

17. Attorney Satter represented and advised WFA and its Kenwood Branch regarding hiring practices, raiding claims, fiduciary duty claims, restrictive covenants, and other contractual obligations applicable to WFA and financial advisors.

18. Throughout his time at WFA, Attorney Satter acquired confidential and privileged information regarding WFA's handling of these legal issues and related disputes.

19. Although Attorney Satter represented to WFA in April 2022 that he was "retiring," Attorney Satter worked to found DayMark and now serves as its legal counsel.

20. As a condition of his employment with WFA, Attorney Satter executed a Wells Fargo Team Member Acknowledgement, in which he acknowledged his agreement to honor all terms and policies contained in or referenced in the Wells Fargo Team Member Handbook ("Handbook").

21. The Handbook required that Attorney Satter not "[c]ompete directly or indirectly with Wells Fargo," not "[d]ivert business from Wells Fargo," and not "[f]ail to act in Wells Fargo's best interest." *Id.* at 133. It also required compliance with WFA's Code of Ethics and Business

Conduct policy during and after his employment, which prohibited Satter from "sharing any proprietary, confidential information or trade secrets about Wells Fargo, employees, customers, or third-party service providers . . . ." *Id*. at 103. The Handbook further required that Attorney Satter not take advantage of Wells Fargo work-related information. *Id*. at 139, 145.

22. Attorney Satter also made binding commitments in the Restricted Share Rights Award Agreements ("Shares Agreements") applicable to him. In particular, Attorney Satter agreed not to solicit WFA employees and not to disclose WFA's proprietary information or to use it for purposes other than conducting business on behalf of Wells Fargo or WFA. Attorney Satter further acknowledged through the Shares Agreements that he would not use WFA Trade Secrets and other proprietary information other than for the purpose of conducting business on behalf of WFA, and he promised to "keep such Confidential Information confidential and not divulge, use or disclose this information except for that purpose." *Id*. at ¶ 9(a).

23. The Shares Agreements also contain Attorney Satter's promise that during the relevant time, he would not "directly or indirectly . . . solicit, recruit or induce the solicitation or recruitment of any employee or consultant of [Wells Fargo & Company and its affiliates] for the purpose of encouraging that employee or consultant to leave [Wells Fargo & Company and its affiliates] employ or sever an agreement for services . . . ." *Id*. at ¶ 9(c)(i). The Shares Agreements are governed by Delaware law, and are valid and enforceable against Attorney Satter. *Id*. at ¶¶ 16, 9(e).

24. As WFA's former in-house counsel, Attorney Satter also would have known that the Former Employees had also executed their own acknowledgements of the Handbook requirements and obligations.

5

25. In addition to the Handbook, on information and belief Attorney Satter also likely knew of other commitments binding on the former Employees. For example, one co-conspirator, Mr. Beischel was subject to a one-year post-employment non-solicitation obligation set forth in Mr. Beischel's "Supplementary Training Agreement For A Financial Consultant."

26. Messrs. Beischel and Michael Larison were also subject to Financial Consultant Agreements that remain in effect and prohibit solicitation of other WFA employees.

27. Messrs. Demo, Michael Larison, and Eric Larison were also subject to non-solicitation obligations in their WFA PCG team agreements ("Team Agreements"). The Team Agreements prohibited those WFA financial advisors from recruiting certain clients associated with their respective teams.

28. Michael and Eric Larison were also subject to non-solicitation obligations set forth in a WFA Financial Advisor Succession Agreement.

29. Messrs. Quin and Eric Larison were also subject to Trade Secrets Agreements that prohibit the solicitation of WFA employees or clients.

30. Finally, Attorney Satter knew that unfulfilled promissory notes prohibit solicitation of WFA clients by departing financial advisors. Messrs. Demo and Quin had unfulfilled promissory notes when they resigned from WFA.

31. Additionally, of course, as a lawyer, Attorney Satter is bound by applicable ethical rules. Those obligations to WFA continued after Attorney Satter purported to "retire" from WFA. Attorney Satter was thereafter prohibited from representing another client in a matter related to his representation and advice to WFA, where the subsequent client's interests "are materially adverse" to WFA's. This is particularly the case where, as here, Attorney Satter had knowledge of WFA's specific confidential and privileged matters regarding trade secrets, restrictive covenants, and

dispute strategies regarding Financial Advisors – which were directly relevant to his assistance and advice to DayMark and the Former Employees in relation to the scheme to compete with WFA.

32. Attorney Satter was also required to maintain the confidentiality of WFA information – including trade secrets, privileged, and confidential information – that he accessed or obtained in the course of his representation of WFA, and he was specifically prohibited from using any such information against his former client, WFA.

33. Additionally, as a lawyer "employed or retained by an organization" in his role as a senior Wells Fargo in-house counsel representing WFA, Attorney Satter owed allegiance to his client, WFA, and not to any constituent or other person connected with the organization, including other WFA employees.

34. If Attorney Satter knew or reasonably should have known that a WFA employee's action or intended action violated a legal obligation to WFA, then he should have reported it and proceeded in a manner consistent with the best interest of WFA.

35. WFA and its predecessors invested many years and significant amounts of money in recruiting and retaining its employees, including the Former Employees, and in supporting and fostering the client relationships and business of the Former Employees at the Kenwood Branch. This included WFA's generous compensation of Attorney Satter and the Former Employees, based on the expectation that they would continue to act in WFA's best interest and continue to grow WFA's business and client relationships. Indeed, a substantial amount of the Kenwood Branch's business revolved around the Former Employees' activities and the close client relationships of which WFA facilitated the development and expansion over the years.

**B.     THE PLOT TO FORM DAYMARK**

36.     On information and belief, as early as the summer of 2021, Mr. Quin and the other Former Employees began conspiring to leave WFA, to solicit others to leave WFA, and to form DayMark, a competing business which they would immediately operate after leaving WFA.

37.     During covert meetings and discussions, Mr. Quin and the other Former Employees plotted their simultaneous departure and plans to solicit other WFA employees and WFA clients.

38.     Mr. Quin, the Market Manager for WFA's Ohio region, and Attorney Satter, who was assigned to a region that included the Ohio region, had a longstanding close relationship and socialized frequently.

39.     On information and belief, at some point while Attorney Satter was still employed as WFA's senior counsel, he became aware of Mr. Quin's plans to leave WFA with others and operate DayMark. He did not share his knowledge with WFA.

40.     Since that date, on information and belief, Attorney Satter has used WFA confidential information and trade secrets to provide employment and litigation counsel to DayMark and the Former Employees and help them plot their coordinated departures from WFA and grow DayMark as a competing business.

41.     On March 21, 2022, around the same time that Attorney Satter announced that he would "retire" from WFA effective April 15, 2022, a "DayMark" domain name and website were created.

42.     On March 28, 2022 DayMark was established in Delaware as a limited liability company.

43.     A short time later, DayMark became registered with the Securities and Exchange Commission as a Registered Investment Advisory firm.

44.     On April 15, 2022, Attorney Satter's employment and work for WFA ended.

45. On May 3, 2022, DayMark registered to do business in Ohio.

46. On June 6, 2022, Attorney Satter was at DayMark's Cincinnati office to assist the Former Employees who had resigned from WFA that same day. Attorney Satter also communicated with a former colleague in Wells Fargo's Legal Department that same day in an effort to downplay DayMark's competition with WFA.

47. Mr. Satter was in a unique position to utilize his experience and inside knowledge of sensitive WFA information – which he gained as WFA's senior counsel – for the benefit of DayMark and the Former Employees.

48. During his several years with WFA, Mr. Satter was responsible for advising WFA regarding the hiring of financial advisors, "raiding" claims, fiduciary duty claims, and restrictive covenants and other legal concerns applicable to financial advisors.

49. In the course of representing WFA, Mr. Satter acquired confidential and privileged WFA information – regarding WFA's legal methodologies and strategies related to employment disputes and group departures, including how WFA assesses the impact of such departures and whether and how to pursue responsive legal actions.

50. On information and belief, Mr. Satter has used WFA confidential and privileged information to advise and counsel DayMark and the Former Employees regarding the legal consequences of their coordinated departure and WFA's response, and is still doing so today.

51. On July 13, 2022, WFA filed a Statement of Claim with FINRA and initiated arbitration against the Former Employees. Since then, Attorney Satter shared with WFA representatives that he intended to do whatever he could to cause WFA to regret having filed the FINRA Arbitration, and explained that his plan would be to "shove" WFA's Statement of Claim into the posterior of a certain senior WFA executive.

52. Given Attorney Satter's intimate knowledge of WFA's confidential information and his expressed disregard for WFA and its filing of a FINRA arbitration, it is inevitable that when rendering advice to DayMark and the Former Employees in a manner adverse to WFA, Attorney Satter will use and disclose WFA trade secrets, privileged, and confidential information, which he obviously can neither forget nor ignore from his fourteen year engagement as WFA's legal counsel.

53. Attorney Satter's actions from sometime prior to his announced "retirement" from WFA and through today were intended to have and did have the effect of substantially reducing WFA's business and presence in the Cincinnati metropolitan region, including the termination and interruption of WFA relationships with clients and employees.

54. Attorney Satter's unlawful conduct has significantly injured WFA's business and has caused substantial damages, including lost business, lost profits, damage to goodwill, and costs of hiring and retaining employees, in amounts to be determined.

## COUNT ONE
### (Civil Conspiracy)

55. WFA realleges each of the above paragraphs as if fully set forth here.

56. Attorney Satter, Mr. Quin and the other Former Employees who now work for DayMark engaged in a malicious conspiracy that caused injury to WFA through unlawful acts, including but not limited to tortiously interfering in WFA's contracts, relationships, and prospective relationships with employees and clients, which interference was independent from the conspiracy itself and by misappropriating WFA trade secrets.

57. As a direct and proximate result of that conspiracy, WFA has been damaged in an amount to be determined at trial but which exceeds $75,000.

## COUNT TWO
### (Breach of Contract)

58. WFA incorporates the preceding paragraphs as if fully restated herein.

59. Enforceable contracts exist between WFA and Attorney Satter.

60. WFA has performed all obligations it owed to Attorney Satter.

61. Attorney Satter was contractually bound to: (i) act in WFA's best interest, (ii) not compete with WFA during his WFA employment, (iii) maintain the confidentiality of certain proprietary information of WFA, including information about WFA's business and business methods, (iv) not use such confidential information for any purpose other than conducting business on behalf of WFA, and (v) not solicit WFA employees to terminate their employment with WFA for one year following termination of his own employment at WFA.

62. On information and belief, Attorney Satter violated each of these contractual obligations by helping to coordinate the departure of the Former Employees to join a competing firm that he founded by soliciting other WFA employees to leave WFA and join DayMark, and by soliciting clients – through the Former Employees – to move their business from WFA to DayMark.

63. Attorney Satter also violated the contractual obligations contained in the Handbook and in his Shares Agreements, on information and belief, by using confidential information about WFA's legal business and business methods for the improper purpose of advising the Former Employees on how to facilitate their group departure and compete with WFA.

64. As a result of the foregoing, Attorney Satter breached his contractual obligations and is liable for damages to WFA in amounts to be determined in an amount in excess of $75,000.

## COUNT THREE
### (Tortious Interference With Employment Contracts)

65.  WFA incorporates the preceding paragraphs as if fully restated herein.

66.  Prior to the Former Employees' coordinated departure from WFA, which on information and belief Attorney Satter played a key role in facilitating, WFA enjoyed advantageous relations and contracts with the Former Employees, which WFA reasonably expected would continue to inure to its economic benefit.

67.  WFA enjoyed substantial profit from these contracts and relationships.

68.  WFA invested many years and significant amounts of money in soliciting, developing and maintaining such relationships and growing the business.

69.  Attorney Satter's interference with such contracts was accomplished by wrongful means as part of a scheme with the Former Employees to misuse confidential information, unlawfully solicit WFA employees, and take over $1,200,000,000 in AUM for Attorney Satter's and the Former Employees' own personal benefit.

70.  On information and belief, Attorney Satter utilized confidential information he obtained in his role as WFA's long-term senior counsel in order to help plan and carry out the departure of the group in a manner intended to cause the greatest harm to WFA's business, and such efforts continue to date.

71.  Attorney Satter's conduct thus constitutes tortious interference with WFA's contracts and he is liable for damages to WFA in amounts to be determined which exceed $75,000.

## COUNT FOUR
### (Tortious Interference With Relationships and Prospective Relations)

72.  WFA incorporates the preceding paragraphs as if fully restated herein.

73. Prior to the Former Employees' coordinated departure to DayMark, which on information and belief Attorney Satter played a key role in facilitating, WFA enjoyed advantageous economic and business relations with its Former Employees and clients of its Kenwood Branch. WFA reasonably expected these economic and business relations would continue to inure to its economic benefit.

74. WFA enjoyed substantial profit from these relationships and this business, and had invested many years and significant amounts of money in soliciting, developing, and maintaining such relationships and growing the business.

75. Given this and the relationship of trust and confidence developed between WFA and its Kenwood Branch employees and clients, WFA reasonably expected that its current and prospective business relationships with these employees and clients would continue in the future.

76. Attorney Satter's interference with such business relations was accomplished by wrongful means as part of a scheme with the Former Employees to unlawfully solicit WFA employees and misappropriate WFA's confidential and proprietary information, in order to compete with WFA for Attorney Satter's and the Former Employees' own personal benefit.

77. On information and belief, Attorney Satter utilized confidential information he obtained in his role as WFA's long-term senior counsel in order to help plan and carry out the departure of the group, in a manner intended to cause the greatest harm to WFA's business, and such efforts continue to date.

78. Attorney Satter's conduct thus constitutes tortious interference with WFA's actual and prospective business relationships, and he is liable for damages to WFA in amounts to be determined which exceed $75,000.

## COUNT FIVE
### (Breach of Fiduciary Duty and Duty of Loyalty)

79. WFA incorporates the preceding paragraphs as if fully restated herein.

80. In Ohio, employees owe their employers a duty of loyalty and good faith.

81. Attorneys also owe their clients fiduciary duties, arising in part from the special trust and confidence clients place in their attorneys, which require attorneys to act in their clients' best interests.

82. These duties extend post-employment, prohibiting former employees (including former in-house counsel) from disclosing confidential information of their former employers or clients and from using such information for the benefit of a competitor.

83. As a senior in-house counsel representing WFA, Attorney Satter represented and advised WFA regarding employment disputes and legal issues related to financial advisor hiring practices, raiding claims, fiduciary duty claims, non-solicitation and other contractual obligations. He also received WFA trade secrets and confidential information, which Attorney Satter gained close familiarity with only as a result of his role as WFA's counsel.

84. In that role, Attorney Satter occupied a position of special trust with WFA and owed WFA fiduciary duties, as its lawyer and employee, including a duty of loyalty.

85. Those duties were particularly implicated here, where Attorney Satter became aware at some point of the Former Employees' efforts to form DayMark and compete with WFA, in violation of their own duties to WFA, and where, upon information and belief, Attorney Satter himself became involved with coordinating and advising the Former Employees' on their departure from WFA.

86. Attorney Satter betrayed the trust that WFA placed in him as its senior counsel when, on information and belief, he (i) became aware of the formation of DayMark and the Former

Employees' secret efforts to compete with WFA but failed to report such efforts to WFA, (ii) leveraged his own senior counsel position at WFA and the relationships and confidential information he obtained in that position to aid in their efforts and help coordinate the departure of the Former Employees to join DayMark, and (iii) advised those Former Employees in matters that he knew violated their obligations to WFA, in a manner directly adverse to WFA's interests, utilizing his inside knowledge of WFA's legal playbook on employment, fiduciary duty and raiding issues.

87. On information and belief, to date Attorney Satter continues to utilize WFA privileged and confidential information that he acquired during the course of his representation of WFA for the benefit of DayMark and the Former Employees and to the detriment of WFA.

88. As a result, Satter breached his fiduciary duties, including his duty of loyalty, to WFA and is liable for damages to WFA in amounts to be determined which exceed $75,000.

### COUNT SIX
### (Punitive Damages)

89. WFA incorporates the preceding paragraphs as if fully restated herein.

90. On June 6, 2022, the Former Employees simultaneously resigned and joined DayMark.

91. On information and belief, Attorney Satter was with them that day to help coordinate their move to DayMark and maximize the harm that would befall WFA by their recruitment and solicitation of WFA clients.

92. Shortly after the Former Employees collectively submitted nearly identical resignation notices, Attorney Satter contacted WFA in an effort to play down the coordinated departures. Attorney Satter called a former colleague in Wells Fargo's Legal Department to insist

that WFA should not be concerned with the group joining a competing business only minutes down the street from the Kenwood Branch.

93. Attorney Satter was thus plainly involved prior to the day of the mass resignations, having arranged to be on-site that day to help facilitate the Former Employees' move and then actively engaging with WFA's legal team in an apparent effort to forestall or blunt WFA's legal response.

94. Attorney Satter has also continued to advise DayMark and the Former Employees regarding their ongoing dispute with WFA.

95. Shortly after WFA initiated the FINRA arbitration, Attorney Satter contacted Wells Fargo's Legal Department to advise that DayMark and the other respondents in that action intended to vigorously defend themselves. On information and belief, Attorney Satter is currently advising the Former Employees in connection with their pending arbitration with Attorney Satter's former client WFA, regarding their misconduct while still employees of his former client and in relation to their contractual and legal obligations to his former client.

96. Attorney Satter's actions, as detailed above, were undertaken with actual malice and consciousness of the near certainty or great probability that substantial harm will be caused by the above described tortious behavior.

97. Accordingly, WFA is entitled to an award of punitive damages and attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, WFA requests judgment as follows:

A. A preliminary and permanent injunction to prevent Attorney Satter from using privileged and confidential WFA information in a manner adverse to WFA;

B. An award to WFA of compensatory damages in an amount to be determined at trial which exceed $75,000;

C.      An award to WFA of punitive damages in an amount to be determined at trial;

D.      An award to WFA of the costs and disbursements of this action, together with its attorneys' fees and costs and expert fees and costs; and

E.      An award to WFA of such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

*/s/ Michael A. Roberts*
Michael A Roberts (0047129)
GRAYDON HEAD & RITCHEY LLP
312 Walnut St., Suite 1800
Cincinnati, Ohio 45202
(513) 629-2799
Fax: (513) 333-4330
mroberts@graydon.law

David G. Hille (*pro hac vice application to be filed*)
Gregory M. Starner (*pro hac vice application to be filed*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

*Attorneys for Plaintiff*
*Wells Fargo Clearing Services, LLC*

## JURY DEMAND

WFA demands a trial by jury on all issues triable by a jury.

*/s/ Michael A. Roberts*